UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 22-297 (DWF/DTS)

| | |
|---|---|
| UNITED STATES OF AMERICA,  )<br>   )<br>   Plaintiff,   )<br>   )<br>v.   )<br>   )<br>DARRIAN MITCHELL NGUYEN,  )<br>   )<br>   Defendant.   ) | **GOVERNMENT'S POSITION WITH RESPECT TO SENTENCING** |

The United States of America, by and through its attorneys, Andrew M. Luger, United States Attorney for the District of Minnesota, and Andrew R. Winter, Assistant United States Attorney, hereby submits its position with respect to the sentencing of defendant Darrian Mitchell Nguyen (the "Defendant"). On March 20, 2023, Defendant pled guilty to one count of Possession with the Intent to Distribute 50 Grams or More of a Mixture and Substance Containing a Detectable Amount of Methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B), and one count of Unlawful Possession of a Machine Gun, in violation of 18 U.S.C. §§ 922(o) and 924(a)(2). The Presentence Investigation Report ("PSR") calculated Defendant's total offense level to be 29 and his criminal history category to be I, resulting in a Sentencing Guidelines range of 87 to 108 months' imprisonment. PSR ¶ 97. The United States asks that the Court adopt the factual findings and Guidelines calculations contained in the PSR as its own. For the reasons set forth below, the Government believes that a sentence of 108 months' imprisonment is

sufficient, but not greater than necessary, to achieve justice in the sentencing of this defendant.

## BACKGROUND

During the spring of 2022, the FBI initiated an investigation into Defendant based on information obtained from a Confidential Human Source (the "CHS") regarding the CHS's contacts with Defendant over the course of several years up until 2020. PSR ¶ 8. During this period, the CHS had observed Defendant in possession of explosives devices, firearms, and methamphetamine, which were stored in hidden rooms in Defendant's residence, and the CHS heard Defendant express his desire to join an anti-government militia. *Id.* The CHS described Defendant as harboring anti-government Three Percenter militia ideology and desiring to be part of the Three Percenter militia group.[1] *Id.* The CHS also described Defendant as maintaining anti-government symbols in his garage, including a flag with the Three Percenter logo[2]. *Id.*

On July 13, 2022, at the FBI's request, the CHS met with Defendant at the same residence where Defendant lived in 2020. *Id.* at ¶ 9. The CHS owed Defendant a debt—

---

[1] Three Percenter militia (aka Three Percenters or III%) are a loosely organized anti-government extremist movement associated with the broader "Patriot" movement. The concept behind the Three Percenter name is based on a historically incorrect myth that only three percent of the American population fought against the British during the American Revolution. Today, Three Percenters view themselves as modern-day American heroes analogous to those who fought in the American Revolution, but their perceived enemy is not the British; rather it is the U.S. Government. Three Percenters claim they are the three percent of Americans who will fight during a future revolution against the alleged tyranny of the U.S. government.

[2] The CHS had previously given this flag to Defendant – but did so at least one year prior to the events described in the PSR.

2

consisting of $9,000, two ARs, and a sheet of acid—as a result of losing Defendant's money intended for a drug purchase in 2020. *Id.* The July 13 meeting was audio recorded. *Id.* During this meeting, the CHS told Defendant that the CHS was there to correct the debt owed to Defendant. *Id.* Defendant, however, did not want money to correct the debt, but instead asked the CHS to provide him with firearms. *Id.* The CHS attempted to clarify with Defendant what type of firearm Defendant wanted, and Defendant stated he would like the firearm to be fully automatic. *Id.* Specifically, Defendant said he wanted a short-barreled rifle with an auto sear installed on it. *Id.*

During the meeting, the CHS asked Defendant if he was interested in additional business and selling narcotics to a third party. *Id.* Defendant indicated he was interested but said he would like the CHS to first pay back the debt owed from their interactions in 2020. *Id.*

On August 9, 2022, the CHS met Defendant again at Defendant's residence.[3] *Id.* at ¶ 11. During the meeting, Defendant and the CHS discussed the firearms that Defendant wanted from the CHS. After the meeting, the CHS reported to law enforcement that during his disccission with Defendant about a firearm in Defendant's possession that was equipped with what the CHS believed was a grenade launcher, Defendant stated he had not fired the weapon but hated BLM and wanted to "level a whole block of blacks." *Id.* at ¶ 10.

Defendant also discussed additional narcotics dealing with the CHS. *Id.* at 11. Defendant showed the CHS a hidden room in his garage where Defendant was storing bags

---

[3] The meeting was intended to be audio recorded; however, the recording device failed. *Id.* at ¶ 10.

3

of what the CHS believed was methamphetamine. *Id.* at A.4. Defendant ended the meeting by selling the CHS an "8-ball," or approximately 3.7 grams of methamphetamine, for $100. *Id.* at ¶ 11.

After the second meeting, Defendant exchanged text messages with the CHS when the media was reporting on the FBI's execution of a search warrant at former President Donald Trump's residence in Mar-a-Lago. *Id.* at ¶ 10. Specifically, on or around August 13, 2022, Nguyen texted the CHS a link for a Facebook video and wrote, "It's time, the hour has come." The Facebook video included statements and theories articulated by a prominent supporter of Donald Trump, such as: (1) a belief that the FBI has been weaponized against "us"; (2) "they" are coming for the elections; (3) Hunter Biden and Nancy Pelosi need to be arrested; and (4) "we" need people like you to become "lions" against the "Marxist demon left."

On or around August 23, 2022, the CHS met with Defendant again at Defendant's residence. *Id.* at ¶¶ 12-13. The meeting was audio recorded. The CHS asked Defendant to clarify what he meant by the above-referenced text message stating, "It's time, the hour has come." *Id.* at ¶ 10. Defendant said the message was in reference to the FBI search of Mar-a-Lago, that he thought "we should put (sic) a revolution," and that he believed former President Donald Trump should conduct a coup-d'état. *Id.* Defendant stated, "Cause the last—if you look at the twentieth century dude a lot of leaders now are—they are guided by coup de-état, you know? . . . Like Napoleon, Hitler, um . . . Putin and that Chinese motherfucker whoever his name is." *Id.*

4

The CHS and Defendant again discussed what kind of firearm Defendant wanted. *Id.* at ¶ 13. The CHS asked Defendant if he wanted a "long or short" barrel. Defendant responded that he wanted a short-barreled rifle like the one the CHS once had. *Id.* The following is an image of the weapon Defendant was referencing:



The CHS and Nguyen continued to clarify what type of firearm Defendant wanted, and Defendant stated he would be satisfied with a 5.56-caliber short-barreled rifle. *Id.* Defendant stated, "You think uh . . . you think that there's gonna be uh . . . you know, gun fire coming up? If he does a coup de-état right? There's so many leaders that have done a coup de-état you know? Stalin, Hitler, you know." *Id.* at ¶ 10.

During the meeting, Defendant also showed the CHS another "secret" room Defendant had constructed in the residence. *Id.* Defendant told the CHS he was manufacturing methamphetamine in the room. *Id.* At the end of this meeting, Defendant sold the CHS approximately 7.1 grams of methamphetamine for $300. *Id.* at ¶ 12. The same day, Defendant texted the CHS, writing that he was not interested in selling more

5

narcotics to the CHS until the CHS supplied Defendant with the firearm and auto sears. *Id.* at 13.

Based on Defendant's stated desire to obtain a fully automatic short-barreled rifle with auto sears, the CHS conducted a controlled delivery to Defendant of the short-barreled rifle pictured above (which is less than 16 inches in length) with the handguard replaced and an auto sear installed to make it fully automatic. *Id.* at ¶ 13-14. In advance of the controlled delivery, the CHS texted images of the weapon to Defendant, as pictured below:



*Id.* at ¶ 13. The CHS also texted Defendant an image of additional auto sears that Defendant wanted to purchase from the CHS:



*Id.*

The controlled delivery was completed on October 4, 2022. *Id.* at ¶ 14.  The CHS met Defendant at his residence. *Id.*  The CHS provided Defendant with the short-barreled rifle with an auto sear attached and seven additional auto sears, which were contained in a black firearms bag. *Id.*  The CHS asked Defendant if the delivery of the firearm and auto sears settled the CHS's debt, and Defendant affirmed it did. *Id.*

8

Immediately following the controlled delivery, law enforcement executed a search warrant at Defendant's residence and arrested Defendant. *Id.*[4] Law enforcement recovered the weapons from the controlled delivery from the seat of Defendant's car, which was parked in his attached garage. *Id.* at ¶ 15.  Law enforcement also seized 22 other firearms from the residence, including handguns, shotguns, and rifles. *Id.*  One of the rifles was short barreled, and one of the shotguns was modified with a short barrel. *Id.* at ¶ 16.  Most of the weapons were discovered in a "hidden" room in the basement that was created using drywall panels and could only be opened using a screwdriver:

---

[4] Defendant's elderly mother was present at the residence at the time of the execution of the search warrant. *Id.* at 14.  Due to her condition and the unsanitary environment inside of the residence—which included mold on the walls and feces inside the home—law enforcement contacted medical services personnel, and Defendant's mother was transported to a hospital for evaluation. *Id.* at ¶¶ 14, 58.



*Id.* at ¶ 15.

In Defendant's residence, law enforcement also discovered scales, a magnetic stirrer, 221.5 grams of methamphetamine mixture, 18.5 grams of cocaine, and 3.2 grams of MDMA. *Id.* Law enforcement also discovered a Three Percenter flag hanging from the ceiling and manuals relating to manufacturing methamphetamine and bombs. *Id.* A review of Defendant's cell phone revealed messages and other content relating to the manufacture and sale of methamphetamine, as well as neo-Nazi propaganda and images.

Law enforcement has confirmed with the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) that Defendant is not listed on the National Firearms Registry as a person allowed to possess machine guns or other National Firearms Act (NFA) items such as short-barreled rifles. *Id.* at ¶ 16.

## ARGUMENT

### I.   Sentencing Considerations.

The Court must determine what constitutes a sufficient sentence as guided by the factors of Title 18, United States Code, Section 3553(a). As such, the Court must determine the applicable Sentencing Guidelines. Although the Guidelines are advisory, the Court must "remain cognizant of them throughout the sentencing process." *Gall v. United States*, 552 U.S. 38, 50 n.6 (2007). The Probation Office determined that Defendant's Guidelines range is 87 to 108 months of imprisonment.

In addition to considering the Guidelines, Section 3553(a) requires the Court to analyze a number of factors, including the history and circumstances of the defendant, the nature and circumstances of the offense, the need for the sentence to reflect the seriousness of the offense and promote just punishment for the offense, the need for adequate

deterrence, the need to protect the public from further crimes of the defendant, and the need to avoid unwarranted sentencing disparities. Here, analysis of the Section 3553(a) factors suggests that a sentence of 108 months is sufficient, but not greater than necessary, to achieve the objectives of sentencing.

## II. Defendant's Criminal History Category Is Correctly Calculated in the PSR.

Defendant may persist in his objection to the assessment of one criminal history point for a 2013 guilty plea to Possession of a Dangerous Weapon – Metal Knuckles. *See* PSR ¶ 49. In that case, Defendant pled guilty to the offense and received a stay of imposition of his sentence and one year of probation. In 2015, Defendant's term of probation ended, and the charge was dismissed.

But the Guidelines call for the assessment of one criminal history point in this situation. Specifically, Application Note 9 to U.S.S.G. § 4A1.2 "requires counting prior adult diversionary dispositions if they involved . . . an admission of guilt in open court." According to the note, "This reflects a policy that defendants who receive the benefit of a rehabilitative sentence and continue to commit crimes should not be treated with further leniency." *Id.* Further, Section 4A1.2(a)(3) states, "A conviction for which the imposition or execution of sentence was totally suspended or stayed shall be counted as a prior sentence under § 4A1.1(c)." Defendant pled guilty to the offense, and the dismissal of the charge following the term of probation does not absolve him of the assessment of the criminal history point.

In any event, whether Defendant receives one criminal history point has no impact on the calculation of his Guidelines range; either way, his criminal history category is I.

### III.   Use of Actual Methamphetamine Calculation vs. Mixture

Defendant objects to the use of the methamphetamine actual guideline (BOL of 32) versus the mixture guidelines provision (BOL of 26). Probation has correctly calculated a BOL of 32 and Defendant does not disagree with these calculations, but rather disputes the guidelines themselves. To the extent Defendant seeks a variance based upon a policy disagreement, he is entitled to do so. Even if this Court agrees with Defendant on this point, this is not the case for the Court to exercise its discretion given the public-safety threat presented and the Section 3553(a) factors discussed below.

### IV.   The Section 3553(a) Factors Support a Sentence of 108 Months' Imprisonment.

#### A. History and Characteristics of Defendant.

Section 3553(a)(1) states that a sentencing court must first consider "the history and characteristics of the defendant." Over the course of many years, Defendant has sold methamphetamine, stockpiled weapons in hidden corridors, and espoused radical and dangerous views. He did not stop this conduct until law enforcement apprehended him.

While Defendant has been assessed at the lowest criminal history category, this categorization does not provide a complete picture of Defendant's criminal activity. In 2002, Defendant was involved in a nationwide conspiracy involving the importation of controlled substances from Canada. PSR ¶ 47. In the course of the investigation into those crimes, law enforcement learned that Defendant was involved in obtaining firearms and

13

engaging in gunfire during drug sale transactions. *Id.* While Defendant did not incur any convictions as a result of this conduct, the conduct highlights Defendant's previous involvement in drug trafficking and his conduct involving firearms.

Defendant's upbringing as documented in the PSR does not explain the criminal conduct in this case. While Defendant appears to have been impacted as a child after observing the troubling behaviors of his mother, who suffered from mental illness, Defendant was ultimately raised in the sole custody of his father, a physician. *Id.* at ¶ 61. He received "A" and "B" grades in high school and was gainfully employed throughout his adulthood. *Id.* Unlike many defendants who appear before this Court, Defendant received the care and opportunities that many criminal defendants do not.

Defendant appears to have suffered from addiction to methamphetamine beginning in his thirties. *Id.* at ¶ 77. While this addiction is likely closely tied to his drug trafficking offenses, substance abuse does little to explain Defendant's stockpiling of weapons, desire to obtain fully automatic weapons, possession of bomb-making manuals, and articulated viewpoints regarding a desire for a violent uprising.

All of these factors, viewed as a whole, support a sentence at the high end of the Guidelines range.

    B. <u>Nature and Circumstances of the Offense</u>.

The second factor a sentencing court must consider is "the need for the sentence imposed — to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment." 18 U.S.C. § 3553(a)(2)(A). This requirement extends beyond, but also overlaps to some extent with, the "nature and circumstances of the offense"

14

component of Section 3553(a)(1). The Section 3553(a)(2)(A) consideration is the "just desserts" concept, which carries the need to make the punishment fit the crime, and the need not just to punish, but to punish justly. "[I]t is another way of saying that the sentence should reflect the gravity of the defendant's conduct." Committee on the Judiciary, Report No. 98-225, 98 Cong. 1st Sess. 1983, p. 75.

Defendant's conduct is in this case is extraordinarily troubling. His possession of illegal firearms and devices capable of converting his readily accessible collection of firearms into fully automatic weapons, combined with his drug trafficking activity and extremist ideology, paints a potentially deadly picture. The fact that he discussed obtaining fully automatic weapons in conjunction with the possibility of a coup-d'état serves to illuminate the danger presented by Defendant which, in turn, underscores the appropriateness of a sentence of 108 months.

    C. <u>The Need for Deterrence</u>.

Section 3553(a)(2)(B) instructs that a criminal sentence needs "to afford adequate deterrence to criminal conduct." A criminal sentence should take into account specific deterrence with respect to the particular defendant and general deterrence with respect to potential future criminals.

As to specific deterrence, Defendant was not deterred from trafficking in drugs or obtaining illegal weapons when he was arrested and charged with crimes based on similar conduct in 2002. He has attempted treatment for his substance abuse issues in the past, and he walked away from the program. *Id.* at ¶ 78. A significant sentence is required to deter Defendant's future criminal activity.

General deterrence is necessary to deter other people from committing similar crimes. "Congress specifically made general deterrence an appropriate consideration . . ., and we have described it as 'one of the key purposes of sentencing.'" *Ferguson v. United States*, 623 F.3d 627, 632 (8th Cir. 2010) (quoting *United States v. Medearis*, 451 F.3d 918, 920 (8th Cir. 2006)). General deterrence is necessary to impress upon the greater community that no matter the circumstances, aiding a designated terrorist organization – no matter what the purpose – has dire consequences. Here, a substantial sentence serves to deter other individuals from the deadly combination of stockpiling machineguns and selling methamphetamine.

    D. <u>The Need to Protect the Public.</u>

Section 3553(a)(2)(C) instructs that a criminal sentence needs to serve to "protect the public from further crimes of the defendant." Consequently, in sentencing Defendant, the Court must weigh the need to protect the public from his future crimes. *See* 18 U.S.C. § 3553(a)(2)(C). "The basic task is to predict the likelihood that the offender will commit further offenses, assess the potential seriousness of those offenses, and determine the need to incapacitate the offender as a prophylactic measure." *United States v. Irey,* 612 F.3d 1160, 1238 (11th Cir. 2010).

Defendant's record reflects an individual who will continue to collect weapons and sell drugs unless he is stopped. The substance abuse treatment he has participated in has not been effective. The Court is in a position to protect others from harm—both from the drugs he sells and violence he states he wants to commit.

E. <u>Avoidance of Unwarranted Disparities</u>.

Section 3553(a)(6) notes that a sentencing court must address "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Defendant's situation is unique in that it involves a combination of drug trafficking and the possession of illegal weapons (which are commonly charged together) with an added danger relating to Defendant's extremist ideology. A sentence of 108 months' imprisonment under this set of facts will not cause sentencing disparities.

V. **<u>A Supervised Release Term of Five Years Is Appropriate Under the Circumstances Present Here.</u>**

Supervised release "is a unique method of post-confinement supervision," *Gozlon-Peretz v. United States*, 498 U.S. 395, 407 (1991), that "fulfills rehabilitative ends, distinct from those served by incarceration." *United States v. Johnson*, 529 U.S. 53, 59 (2000). It "is not punishment in lieu of incarceration." *United States v. Granderson*, 511 U.S. 39, 50 (1994). Rather, "congressional policy in providing for a term of supervised release after incarceration is to improve the odds of a successful transition from the prison to liberty." *Johnson v. United States*, 529 U.S. 694, 708-09 (2000). In this case, five years of Supervised Release is necessary to ensure that Defendant will remain drug free and law abiding.

## CONCLUSION

Based on the foregoing and arguments to be made at sentencing, it is the position of the United States that a sentence of 108 months' imprisonment is a sufficient sentence, but

not greater than necessary, after consideration of all the relevant sentencing factors set forth in 18 U.S.C. § 3553(a).

Dated: July 20, 2023

Respectfully Submitted,

ANDREW M. LUGER
United States Attorney

*s/ Andrew R. Winter*

BY:  ANDREW R. WINTER
Assistant United States Attorney
Attorney ID No. 232531